CHARLES VAN PELT, and STANLEY NORRIS VAN PELT and ROBERT L. VAN PELT, Minors, by CHARLES VAN PELT, Guardian and Curator, v. NANCY C. PARRY, Appellant.

Division One, March 31, 1909.

1. SWAMP LANDS: Power of County Court: Trust: Estoppel. Under the Acts of 1855 and 1857 and other acts of the General Assembly, the absolute title to swamp lands was vested in the respective counties, divested of all trusts (except the proceeds could not be diverted from the school fund), and the county court was authorized to dispose of them as it might think conducive to the interests of said county; and estoppel may be invoked against a county to prevent it from questioning its disposition of such lands, and the doctrines of ratification and laches may be applied in exceptional cases where the facts warrant their application.

2. ————: ————: Location of County Seat. The county court in 1857 had the power to locate the county seat upon swamp lands then owned by the county, and to set aside a part of the tract for county purposes, and to provide for the sale by lots of the balance. And if in fact the county did own the lands, it is of small consequence that the county court did not believe it owned them, for that prior thereto a private citizen had filed a certificate of entry therefor in the United States Land Office, and the county court, believing the county did not own them, proceeded to buy them from him.

3. ————: ————: ————: Appropriation. Where the county was the owner of the swamp land, and the county court, under the powers invested in it by statute, made a visible and actual appropriation of the land for the purpose of establishing a permanent seat of justice, and coupled that appropriation with acts *in pais* by platting the land into blocks, lots, streets, alleys and public squares, and by making sales of the lots, it effectually for all time took the land out of the salable list of swamp lands as

such, and it could not in after years turn about and trade or sell it to a purchaser having full notice that it had been devoted to a seat of justice for the county.

4. ——————: ——————: ——————: ——————: Deed from Entryman: Effect: Dower. In 1856 Parry had entered the land on a land warrant, but never received a patent, and the same year the county was created by an act of the General Assembly, and the commissioners met in 1857 and located the county seat on the land, and the county court ordered the land to be platted and lots to be sold, which were done, Parry and his then wife having in December, 1856, made a warranty deed to the county. In 1867 it was discovered that the land was swamp land, under the act of Congress, and under the acts of the General Assembly belonged to the county, and Parry's entry was canceled, and thereupon, upon the theory that Parry had paid to the county $1.25 per acre for the land, he received a patent from the State and a deed from the county, and in 1869 for an expressed consideration of one dollar he made a deed to the county to supply his former deed which had been destroyed, in which he recited that, "I do by these presents remise, release and forever convey" said lands. Parry's first wife died and in 1862, he married again, and this wife did not join in the deed of 1869, and she now sues for dower. Held, first, that Parry's deed of confirmation in 1869 was, in legal effect, a solemn recognition by him of a prior, subsisting, irrevocable and dominant appropriation by the county of the land and its proceeds to a public use distinct from swamp land purposes, and was equivalent to an admission that the fee simple estate did not pass to him by the conveyances of 1867 and that he was merely seized to the use of the county in a trust relation, if at all; second, if his deed to the county in 1856 did not convey title, it at least contributed any right he thought he had as entryman to the establishment of the seat of justice and removed any then apparent cloud upon the title, and his deed of 1869 tends to the same end and in terms related back to his deed of 1856; third, if Parry was seized at all after his deed of 1856, he was seized to the use of the county, and not of an estate of inheritance, and his seizin, therefore, will not support dower; and, fourth, so much of the land as was set aside for a public square, streets, alleys and a jail lot, was devoted to a public use, and as to that land Parry's second wife in no event was endowed; but it is not necessary, in view of the holding that Parry had no estate of inheritance in the land, to determine whether that doctrine applies to the lot in question, which was one sold to a private person by the county, and therefore that question is reserved.

5. EVIDENCE: Lost Records. Where primary evidence is lost, secondary evidence is allowed to establish lost records, deeds, surveys and plats, for the purpose of reconstructing for judicial uses facts and a situation dimmed by time.

Appeal from Jasper Circuit Court.—*Hon. Hugh Dabbs,*
Judge.

AFFIRMED.

*Wright Bros.* and *James T. Blair* for appellant.

(1)   The land being admitted and proved to be
swamp land, originally the title vested in Barton coun-
ty prior to 1856.   Clarkson v. Buchanan, 53 Mo. 569;
Railroad v. Smith, 9 Wall. 95; Campbell v. Wortman,
58 Mo. 259; Foster v. Evans, 51 Mo. 40.   (2)   The cer-
tificate of title to Parry in 1856 conveyed no title to
him.   Campbell v. Wortman, supra; Hendrickson v.
Grable, 157 Mo. 45.   But the certificate shows the selec-
tion of this land as swamp land was made under the
Act of September 28, 1850, and approved March 2,
1851.   Therein it conforms to plaintiffs' admissions on
the trial.   And the list certified to the Secretary of
State to Barton county shows that this land was
patented to the State.   Cramer v. Keller, 98 Mo. 282.
(3)   The title being in Barton county as swamp land,
no deed from Parry to the county, Parry having no
title, could affect the county's title in any way.   (4)
The title remained in Barton county until it conveyed
to Joseph C. Parry in 1867, as shown by the deeds and
patent offered by defendant.   There has been no prior
conveyance of the tract in suit by the county to anyone.
The title then passed to Parry (whose wife defendant
was at the time).   Simpson v. Stoddard Co., 173 Mo.
445; Laws 1868, p. 67; Barton Co. v. Walser, 47 Mo.
194; Sturgeon v. Hampton, 88 Mo. 215.   (5)   Defend-
ant being the wife of Parry during the time he had the
title, and as she has never alienated her right and
Parry is now dead, she is entitled to dower in the land
in suit as prayed in the answer.   Secs. 2933, 2946, R. S.
1899.   (6)   The conclusion of the court that Parry
executed a deed to Barton county in 1856 is not sup-

ported by competent evidence. No proper foundation for secondary evidence was laid. (a) The county clerk is the proper custodian of the county's deeds. Search in his office by him for the deed of 1856 should have been shown. Search by his deputy is not sufficient. Nor did the evidence justify a conclusion that any diligence was used in the search for the deed. Rhodus v. Sansom, 6 S. W. 849; Josuez v. Connor, 7 Daly (N. Y.) 448. (b) The record book, concerning which the witness testified, though it may have been time-worn, should have been produced and its legibility passed on by the court before secondary evidence of the alleged deed of 1856 was admitted and before the records of other deed in the transcribed records were admitted. (7) The testimony of Ward was based on "having heard the deed read" and was hearsay. Nichols v. Kingdom Iron Ore Co., 56 N. Y. 618. (8) The sole deed of Joseph C. Parry of 1869 to Barton county and its recitals were not competent against defendant, who was his wife at that date. Sec. 2946, R. S. 1899. (a) A recital is not admissible unless a declaration by the same party at the same time would be. Joeckel v. Eastman, 11 Mo. 124; Tyler v. Hall, 106 Mo. 319. (b) Parry being the defendant's husband, a declaration by him and, therefore, a recital in his sole deed, is inadmissible. Hoffman v. Hoffman's Exr., 126 Mo. 496; White v. Ingram, 110 Mo. 482; Wall v. Coppedge, 15 Mo. 448. (c) Parry's direct testimony could not have been used, much less his admissions or recitals. Martin v. Rutt, 127 Pa. St. 308; Burrell v. Uncapher, 117 Pa. St. 353; Fitzgerald v. Brenner, 18 Atl. 744; Peck v. Ward, 18 Pa. St. 506; Clapp v. Engledow, 18 S. W. 147; Campbell v. Quackenbush, 33 Mich. 289; Dawson's Admr. v. Hall, 2 Mich. 395; Yager v. Larsen, 22 Wis. 188; Jones v. McKee, 3 Pa. St. 496; Brown v. Lasselle, 6 Blackf. 147; May v. Little, 3 Ired. Law 27; Gardner v. Kuetts, 8 Jones Law 376. (d) A recital or declaration is inadmissible against

one claiming by title anterior to the reciting deed or date of declaration. Hill v. Draper, 10 Barb. 462; Carver v. Jackson, 4 Peters 87; Crane v. Morris, 6 Peters 611; Cavin v. Smith & Kerr, 24 Mo. 222; Kings land v. Drum, 80 Mo. 648; Renshaw v. Pawnee, 19 Mo. 534; Grady v. McCorkle, 57 Mo. 175; Bartlett v. Tinsley, 175 Mo. 335; Tibbettes v. Langley Mfg. Co., 12 S. C. 465; Reaume v. Chambers, 22 Mo. 53. (e) "And dower is a right in law, fixed from the moment the facts of marriage and seizin concur, and become a title paramount to that of any person claiming under the husband by subsequent act." Grady v. McCorkle, 57 Mo. 175; Williams v. Courtney, 77 Mo. 588; Blevins v. Smith, 104 Mo. 589; Bartlett v. Tinsley, 175 Mo. 335. (9) But conceding, for the sake of argument, that there was a warranty deed executed by Parry to Barton county in 1856 to this land, the facts are that the county already had full title thereto as swamp land and also that the county conveyed it to Parry in 1867 for a lawful consideration. How could the doctrine of inurement, which the court attempts to apply, carry the title conveyed by the county to Parry in 1867 back into the county, Parry's grantor? If so, no grantor who has ever executed a warranty deed could ever again re-acquire the same land from his grantee. Bishop on Contracts, sec. 277; Bush v. Persons' Admr., 18 How. 83.

*Cole, Burnett & Moore* for respondents.

(1) A deed, lost or destroyed, may be proved by oral or circumstantial evidence. Simmons v. Hewitt (Tex.), 87 S. W. 188; Graham v. O'Fallon, 3 Mo. 511; Bohart v. Chamberlain, 99 Mo. 622; Vincent v. Means, 207 Mo. 709; Hiler v. Cox, 210 Mo. 703. In the absence of primary "then secondary evidence is admissible and down to the lowest degree of secondary evidence." Briggs v. Henderson, 49 Mo. 534; Williams v. Mitchell,

112 Mo. 313; McCallister v. Ross, 155 Mo. 94; Kries v. Land & Lumber Co., 121 Mo. App. 199; Mason v. Black, 87 Mo. 340. (2) The recitals in the Parry deed of 1869 was evidence of the execution of the deed of 1856 and its loss or destruction. They are competent evidence against any and everybody; they are independent evidence, not only as to privies, but as to strangers; they are the highest form of declarations and admissions. 1 Greenleaf, sec. 23 and note 1; 16 Cyc. 1217; Lawson on Presumptive Ev., 419, n. 1; Fearn v. Taylor, 3 Bibb 363; Lessee v. Parrish, 3 Ohio 110; Carver v. Jackson, 4 Peters 83; Newman v. Studley, 5 Mo. 295; Wynn v. Cory, 48 Mo. 349; Addis v. Graham, 88 Mo. 202. (3) In no event did the State patent have any effect; swamp lands could only be conveyed by the county. Simpson v. Stoddard Co., 173 Mo. 450. After the proper steps are taken to acquire the land for county seat purposes it becomes "the permanent seat of justice" and the county court cannot abandon it or change it. State ex rel. v. Clark Co., 41 Mo. 51; State ex rel. v. Smith, 46 Mo. 60; R. S. 1899, sec. 6738; State ex rel. v. White, 162 Mo. 538. (4) If Parry did not own it he and those who claim through him are estopped to deny for advantage. 16 Cyc. 1122; Boston v. Richardson, 105 Mass. 370; Hewlett v. Cock, 7 Wend. 373; Long v. McAdow, 87 Mo. 201. Before a widow can be entitled to dower, the husband must be "seized," which implies either actual possession or the right of immediate possession in the deceased husband during coverture. Warren v. Williams, 25 Mo. App. 22; Gentry v. Woodson, 10 Mo. 224. (5) Even if Parry was not the legal owner in 1856, still he undertook to convey the land at that time, and if he thereafter acquired the title, in 1867, it immediately inured to the benefit of the county and its various grantees. When a man makes a deed and afterward obtains a patent, the patent relates back and inures to the benefit of his assigns. 2 Herman on

Est. and Res. Jud., secs. 645, 651, 652; Bogy v. Shoab, 13 Mo. 381; Gibson v. Chouteau, 39 Mo. 566; Norfleet v. Russell, 64 Mo. 177; Ford v. Society, 120 Mo. 508; Fordyce v. Rapp, 131 Mo. 366; Wilson v. Fisher, 172 Mo. 16. (6) After all, the simplest solution of this case is found in the doctrine that a widow is not dowable in land acquired or dedicated for public purposes. So that even on appellant's theory that Parry made no deed in 1856, his first wife joining, or if he did that it conveyed nothing because he did not get title till 1867, and that inurement did not result; still, the Parry deed of 1869, for county seat purposes, terminated appellant's inchoate dower without her joining therein. Venable v. Railroad, 112 Mo. 103; Chouteau v. Railroad, 122 Mo. 375; Baker v. Railroad, 122 Mo. 396; Westerman v. Supreme Lodge, 196 Mo. 709; Chrisman v. Linderman, 202 Mo. 615; Ferguson v. Gentry, 206 Mo. 202; Perry v. Strawbridge, 209 Mo. 643; 14 Cyc. 930.

*Wright Bros.* and *James T. Blair* for appellant in reply.

(1) (a) The dedication must be a public one or it is no dedication. 2 Dillon, Mun. Corp., p. 491; Elliott on Roads and Streets, p. 85. (b) And if the land was dedicated to public use and could not be sold to Parry in 1867, how could it be sold to Van Pelt's grantor in 1869? This is not a suit involving a street, alley, courthouse square or other public place, but a strip to which respondents assert private title. Nor can the new contention that Parry's deed of 1869 was a conveyance for county seat purposes aid respondents. The deed shows it was not so. Nor could the husband by such conveyance, did he attempt it, evade the statute as to dower; and the acceptance of the deed by the authorities, for county seat purposes, cannot be presumed. It did not comply with the

statute, nor is any evidence of such acceptance in the record. (2) Seizin, to support a claim of dower, need not be actual. The right to actual seizin is all that is needed. The question is, did Parry get title to this strip by the deeds from the county in 1867?

LAMM, P. J.—This suit was brought under section 650, Revised Statutes 1899, to try, define and adjudge title to a part of lot three in block thirteen of the city of Lamar (original town)—said part being 15 feet by 120 feet, set forth by metes and bounds. The petition alleges that Charles Van Pelt has a life estate under the will of Mary E. Van Pelt, deceased; that the two minors, Robert and Stanley, own the reversion, to-wit, a fee simple subject to the life estate of Charles; and that the defendant, Nancy, claims an interest or estate in the premises adverse to plaintiffs, although without right or title to do so.

By her amended answer Nancy denies the allegations in the petition and states her claim to be that she was married to one Joseph C. Parry in 1862; that during the existence of that marriage Joseph was seized of a fee simple estate in the land; that she had never released her right of dower; that Joseph died in 1902 and that she is entitled to dower as his widow.

The cause went to the Jasper Circuit Court on change of venue.

In that court plaintiffs filed an amended reply, traversing the allegations of the answer, averring that the Joseph C. Parry mentioned therein was twice married; that his first wife was Josephine, who died prior to 1862; that in the month of December, 1856, he and his then wife, Josephine, executed a good and sufficient deed conveying all the right, title and interest in and to said lot and other land to Barton county, Missouri, as a "county site," and for county seat pur-

poses and that for ten years and more immediately subsequent to the date of said deed and at all times since said date, said county and its grantees, under whom plaintiffs hold, were in open, actual, adverse, exclusive, continuous and notorious possession of the lot in controversy under a claim of ownership, and that said Joseph, after the execution of said deed, never had title or was seized or was in possession, or made any claim thereto.

The issue being whether Nancy has dower in the *locus*, the court rendered judgment against her, and she appeals.

The case in some phases is singular. The original town of Lamar, the county seat of Barton county, is located on what the record calls the "Parry forty" and the "Peters ten," *i. e.*, on fifty acres of land designated in that way. The lot in question is part of the "Parry forty," described as the southwest quarter of the northwest quarter of section 30, township 32, range 30. In 1855 Barton county was established by an act of the Legislature, commissioners were named to locate its county seat, and the new county was added to the Thirteenth Judicial Circuit. Said commissioners were required to meet at "the dwelling house of George E. Ward." They met at the designated place and located the county seat, selecting the site as the Parry forty and the Peters ten. Thereupon early in 1857 a town, named Lamar, was surveyed and platted with streets, alleys and a public square, all under the auspices of the county authorities in establishing a county seat—witness an order of the county court recorded in the recorder's office and fortunately preserved from the wreck of that period:

"It is ordered by the county court of Barton county that Allen Petty, the commissioner of county seat of Barton county, proceed to lay off said seat of justice, commencing with a square of 400 feet extent each way with streets around said square of 80 feet

width, crossing at right angles and extending through the whole extent of the town. Then to lay off blocks of 400 feet front and 160 feet back and lay off said blocks into lots with 80 feet front and 160 feet back; then proceed to lay off another tier of blocks similar in every respect to the former. The last-named tier of blocks to be separated from the first by alleys fourteen feet in width, running at right angles and extending through the whole length of the town; then proceed to lay off another tier of blocks to be separated on the rear of said second tier by streets of fifty feet width, running at right angles through the whole extent of the said blocks to be divided into four lots each. Then proceed to lay off another tier of blocks similar in extent to said blocks to be separated from the next succeeding blocks by alleys fourteen feet in width. Then proceed to lay off another tier of blocks similar in extent to be divided into two lots each, the last named blocks to be separated from the next succeeding blocks by alleys fourteen feet in width. Then proceed to lay off another tier of blocks similar in extent to be divided into two lots each, the last-named blocks to be separated on the rear by streets of fifty feet width, running at right angles and extending the whole length of the town. It is further ordered by said court that said commissioner advertise and sell said lots on the second day of February, A. D., 1857, and that he sell the same on a credit of twelve months, the purchaser giving bond with approved security. It is ordered that no front lot on the public square shall be sold for less than $25.

"I, Branch T. Morgan, clerk of the county court of Barton county, certify the above to be a true copy of an order passed by the county court of Barton county as the same remains among the records of said court. In testimony whereof, I have hereunto signed my name and affixed the seal of said court.

218 Sup—44

"Done at office this 1st day of January, 1857.

"(L. S.)        BRANCH T. MORGAN, Clerk."

Courts were presently opened and regularly held in Lamar until the civil war, the official machinery of the new county was set running and the county offices were located there.

It seems that Joseph C. Parry in December, 1856, met with said commissioners, and, being then the apparent owner of said forty as entryman, joined with his then wife, Josephine, in a conveyance of it to Barton county for a seat of justice; that the deed purported to convey an indefeasible estate in fee simple absolute and was put of record; and that after the town was surveyed and the land platted, the county commenced selling lots and a town grew up there before the civil war. The record shows that Lamar was in the track of irregular maraud and warlike maneuvering on the border during that war, the county was harried by both sides and the town was devastated. Many of its houses were burned, its inhabitants (save two hundred or so) were scattered to the four winds, its temporary courthouse on a lot adjoining the *locus* and its permanent one built on the square went up in smoke and flame, and the records of the county were mutilated, lost or destroyed through the vicissitudes of that war. The Parry deed has never been seen since the war. If recorded, the record perished. The same may be said of the official survey and plat of the town. However, some fragmentary records exist, for example assessment lists and books for the years 1859-60-61. Some mutilated records have been deciphered and re-recorded and were put in evidence. A few old citizens are spared who remember somewhat faintly these ancient transactions, and plaintiffs sought to supply the lost deed and record *data* as best they could by them. Of the company assembled at the home of George E. Ward when the commissioners met, located the county seat and examined and accepted the deed from Parry,

one is alive. The rest are dead. The survivor testified, in effect, that the deed was made by Joseph and his then wife, Josephine, and delivered. The assessment lists aforesaid show that in 1859-60-61, lots in Lamar were assessed by their platted number and proper block and in the *names of a great many owners*, indicating that the records accessible to the then assessors showed deeds had been made and the lots had passed to purchasers and that the town was a *de facto* town. An ancient map was put in evidence, shown to have been long used by county officers for taxing purposes and by conveyancers and the business public generally, though not official. This map showed Lamar laid out with a public square, with named streets, lots and blocks, in the form designated by the foregoing order of the county court, requiring it to be surveyed and platted, and this map has been universally accepted as accurate.

It seems when the war ended the former inhabitants of Lamar in part returned to their homes, and the town, taking on new life, has grown to be a flourishing city. It has been the county seat of Barton county ever since 1857.

Prior to making this deed, if it was made, Parry had in 1856 entered the whole northwest quarter of said section thirty on a land warrant. He never received a patent from the Government. Sometime after the war it was discovered that the tract was not subject to entry and his entry was canceled by U. S. Government officials, as in conflict with the Act of Congress in 1850, relating to swamp lands—said northwest quarter being part of the swamp lands granted to the State of Missouri by that act. After the cancellation of Parry's entry, which was in 1867, as we understand it, the record shows that he and the county court assumed to deal with said northwest quarter on the theory it was *swamp land*. Accordingly, in that year, on the theory he had paid to the county one dollar

and a quarter per acre for said northwest quarter, Parry received a deed from Barton county and a patent from the State of Missouri to said northwest quarter, which deed and patent, under the general description of the land conveyed, included the entire original county seat, then for ten years gone having a *situs* and a name as such county seat. We have no concern with any of the northwest quarter except the county seat land. If these conveyances are held valid and operative as to the Parry forty, ignoring everything done from 1857 to that date, then Joseph thereby became the owner of all the unconveyed lots and blocks in the platted town of Lamar, with its streets, alleys, its public square and the courthouse and jail of Barton county, in a job lot (lock, stock and barrel), at one dollar and twenty-five cents per acre.

Sometime after this he (then married to Nancy) executed the following deed in which Nancy did not join:

"Whereas, I Joseph C. Parry, did on the first day of December, 1856, convey to Barton county, State of Missouri, the following described real estate for a seat of justice for said county, to-wit: the southwest quarter of the northwest quarter and the west half of the west half of the southwest quarter of the northwest quarter of section 30, township 32, range 30, which said deed of conveyance was duly deposited in the recorder's office of said county on or about the 1st day of December, 1856, for record, and, whereas, said deed has since been lost or destroyed, together with the record thereof. Now, therefore, know all men by these presents, that I, Joseph C. Parry, in consideration of the premises and the sum of one dollar to me in hand paid, for the purpose of supplying the record of said deed, do by these presents remise, release and forever convey unto the county of Barton and State of Missouri, and to her assigns the real estate above described. To have and to hold the same with all the

rights and privileges, immunities and appurtenances thereunto belonging unto said county of Barton, expressly excepting and reserving from this conveyance any and all town lots or parcels of real estate to which I may have acquired title since the execution of the deed first aforesaid by purchase from the seat of justice of said county or his assigns. Witness my hand and seal this 1st day of March, A. D., 1869.

"Revenue stamp 50 cents.

."JOSEPH C. PARRY.  (Seal.)"

From that date to his death, in 1902, Joseph C. Parry lived in and about Lamar and at no time questioned the validity of his original conveyance as confirmed by the last one, or laid any claim whatever to any land within the limits of the original town of Lamar, except such as he afterwards acquired to certain lots through *mesne* conveyances from the county. The fact is that after the original location of the county seat in 1856 he never by act or word laid claim to the forty acres platted as the town site of Lamar, other than by taking a deed from the county and a patent from the State in 1867, and by his said subsequent confirmatory deed back.

Defendant's right to dower, if any, is based on the proposition that she was married to Joseph in 1862; that he became seized, during coverture, of the whole northwest quarter of section 30, to-wit, in 1867; that, coverture and seizin uniting, she became endowed; and that, not having released her dower and Joseph dying, she has an interest as dowress.

Plaintiffs darraign title through a conveyance from the county in 1869 to one W. and through him by *mesne* conveyances to their testator. They insist that the title, if any, acquired by Joseph in 1867 to the Parry forty inured at once to the benefit of the county under its former grant from him in 1856 for county seat purposes. Moreover, they question the power of the county to convey to Joseph C. Parry

the site of the county seat as swamp land in 1867. Further, they argue that there was no seizin in Joseph after his marriage to Nancy, hence she could not be endowed; and finally they say that the land-having been dedicated to public purposes by Joseph, that dedication discharged it of Nancy's dower.

In our opinion Nancy C. Parry is not entitled to dower in the Parry forty. This, because:

I.    It is well to settle some things at the start. For example:

(a)    As we grasp the position of respondents' counsel they do not controvert the proposition that Parry, as original entryman on his land warrant, got no title legal or equitable; nor the proposition that his entry was properly cancelled by the United States government.    The doctrine of such cases as Prior v. Lambeth, 78 Mo. 538, therefore, has no application to the case at bar.

(b)    Moreover, respondents' counsel by unmistakable inference concede that the legal title to the whole northwest quarter (barring lots theretofore sold) including as of course the Parry forty, was in the county of Barton in 1867.    This concession renders it wholly unnecessary to consider the various U. S. statutes confirmatory of the prior well-known Swamp Land Act of 1850 (9 U. S. Stat. at Large, p. 519, *et seq.*), whereby the United States granted to the several States the swamp lands within their respective borders.    Nor need we review the various acts of the General Assembly of Missouri in the fifties and sixties whereby title to swamp lands, granted to Missouri under the Federal Act of 1850, was vested absolutely in the various counties of Missouri within which they lie.    The inquiring mind of the student of statutory law, curious to trace the evolution of swamp land enactments, may find them reviewed and discussed in many

cases; for example, in Cramer v. Keller, 98 Mo. 279; Simpson v. Stoddard County, 173 Mo. 421.

(c)   No question is made on the *form* of the deed from Barton county to Parry in 1867. We need not, therefore, inquire whether it was properly executed by the proper official.   The case proceeds on the theory that the title to swamp lands could pass (under ordinary circumstances) from the county by its deed to a purchaser and that the county under the existing statutes could convey.   Irregularities in such deeds seem largely obviated by a confirmatory and curative act.   [Laws 1868, p. 67; Barton Co. v. Walser, 47 Mo. 189.]

(d)   With the foregoing propositions at rest, we come to a main proposition which is of use as a postulate to reason from, *viz.*:   It must be assumed for the purposes of the case that the question (once vexed) whether county courts in dealing with swamp lands dealt with them strictly in a trust capacity with fixed limitations on their powers and under a trust which ran with the lands, is no longer an open one since the case of Simpson v. Stoddard Co., supra.   That case was in Banc.   It was decided by a divided court, but it is the last authoritative utterance on the question in hand.   It is there held that under the Acts of 1855 and 1857 and other acts of the General Assembly, the absolute title to swamp lands was vested in the respective counties, *divested of all trusts,* and the county court of such county was authorized to dispose of them as it might think conducive to the interests of said county.   That case further held, in effect, that estoppel might be invoked against a county to prevent it from questioning its disposition of such lands and the doctrines of ratification and laches might be applied in exceptional cases where facts warranted an application.   We do not understand that case to say that a county can sell swamp land as such and divert the proceeds (if

any), to anything but school fund purposes and nothing we say here must be construed that way.

II.   Assuming that Simpson v. Stoddard County announces good doctrine as summarized under paragraph *d* aforesaid, can that doctrine be applied to the facts in this case and does it determine it? We think so.   This, because:   Barton county was organized under chapter 44, Revised Statutes 1855, entitled, "An Act to Provide for the Organization of Counties Hereafter Established."   A close reading of that chapter shows that it does not specifically provide for establishing a "seat of justice" upon lands owned by the county in its own right prior to the location of its seat of justice, but we conclude such power is assumed to exist.   By section 6 of that act the commissioners appointed "to select a seat of justice for such county" were authorized to purchase or receive a donation of such parcels of land and town lots, including the place selected as a seat of justice, for such county, as they may think proper, not exceeding 160 acres (if purchased) and not less than fifty acres in any case.   By section 7 there is a provision safe-guarding the county as to the title  of the land deeded by the vendor or donor for a seat of justice.   By section 8 it is ordained that "the title of the land so conveyed shall vest in such county, and the place selected shall be the *permanent* seat of justice thereof."   By section 9 it is directed that if the land be purchased, then the county court shall order the purchase money to be paid out of the first proceeds of the sale of lots to be laid out on such lands.   Section 11 directs that the county court appoint a competent person "as a commissioner of the seat of justice of such new county."   Sections 13 and 14 provide a complete scheme for laying off a town at the place selected as the permanent seat of justice "into lots, squares, avenues, streets, lanes and alleys, in such manner and under such regulations"

as the county court shall prescribe.   Lots and squares of ground necessary to erect county buildings shall be reserved from sale by the county court and the scheme contemplates that the residue of the lots shall be sold *as lots* and deeds made.   By section 21 it is ordained that: ''The money arising from the sale of lots, after paying all the expenses accruing in the selection of the seat of justice, in laying out the town and selling lots, shall be applied, first, to paying for the land purchased (if any), and the residue shall be set apart, as a specific fund, for the purpose of erecting county buildings, and shall be applied to no other purpose, until all the county buildings, required by law to be erected, shall be fully completed and paid for.''  Other sections of the act provide for setting up the machinery of the newly-fledged county and putting its courts and offices in running order.

The next chapter of the Revised Statutes of 1855 (Chap. 45), relates to the ''Removal of Seats of Justice.''   We are not concerned with its provisions further than to point out that the idea of permanency is dominant and that the statutes make it exceedingly difficult to remove county seats and have safe-guarded the subject-matter in many ways—the controlling thought being that when a seat of justice is once established it is established for all time unless removed strictly according to written law.

All must agree that the law is related to reason. There are encomiums on the law to the effect that it is the perfection of reason.   What reason could be given for the proposition that county seat commissioners, through the acquiescence of the county court or its ratification, could not locate a seat of justice and lay out a town upon land that already belonged to the county?   Observe, that when, under the statute, land was donated or purchased the sole effect of that donation or purchase was to invest the county with title.   Here, the county already had land and title—

*i. e.,* all it needed for a seat of justice. Keeping that fact well in mind, we conclude that a statute which authorizes land to be bought or begged by way of gift, for a seat of justice, must be held, in reason, to assume by way of necessary implication, that, if there is no necessity of buying or acquiring land as a gift (as in this case), the seat of justice may be rightly located on land it already owns. Otherwise, we would come to the most lame and impotent conclusion that a county must buy or beg when it had the wherewithal ready at hand to avoid doing either. No individual in his sober senses, moving on right lines, would act that way and we shall not presume that the statutes of this State intended a county should act otherwise than with common sense.

It matters little either to law or justice that the commissioners in 1856 may have believed, and that the county court of Barton county then may have been of the opinion, that the Parry forty was not swamp land and that the county got title through Parry's original deed in 1856. The thing *done* is the substance and heart of the matter, not what was *believed,* and the thing done in this instance was to locate a county seat upon the county's own land in 1856. To these ancient official acts the presumption is applied that officials charged with a duty performed that duty by tracking the law and doing what the law either commanded or contemplated they should do. [See authorities cited by respondent's counsel.]

Here, then, was a permanent appropriation and disposition of the land for the purpose of establishing a permanent seat of justice and that visible, actual, palpable appropriation for that important public purpose, coupled with acts *in pais* in platting the land into lots and blocks, streets, alleys, lanes, avenues, public squares, etc., and dealing with the property by making sales of lots to build up a county town, made Lamar a permanent seat of justice to all intents

and purposes and effectually for all time took the Parry forty out of the salable list of swamp lands as such. It was no longer swamp land but land appropriated for county seat ends—*i. e.*, county seat land. Barton county having irrevocably devoted it to county seat purposes, could not turn about in after years and trade or sell it as mere swamp land to a purchaser having full notice that it had been devoted to a seat of justice and that such purpose was alive, on foot, and being carried out. Its power to deal with it as swamp land was *functus officio,* we think. Parry's deed of confirmation in 1869, in legal effect, is a solemn recognition by him of a prior, subsisting, irrevocable and dominant appropriation of the land and its proceeds to a public purpose distinct from swamp land and swamp land funds. In legal effect, it is equivalent to his admission that the fee simple estate did not pass by the 1867 conveyances to him as to the Parry forty and that he was merely seized to the use of the county in a trust relation, if at all.

If Parry did not have title and if his deed in 1856 was not operative to convey title, yet that deed was good for something. It, at least, showed his participation in the establishment of the seat of justice— a participation also shown *aliunde.* It at least contributed any rights he thought he had as entryman to the establishment of the seat of justice, and removed any then apparent cloud from the title. His deed of confirmation in 1869 tends to the same end and in terms related back to his former deed. [Crowder v. Searcy, 103 Mo. 97; Brawford v. Wolfe, *ibid,* l. c. 399, *et scq.*]

We conclude that Joseph C. Parry (taking with full notice, as he did), if seized at all under his swamp land deed and patent of 1867, *was seized to the use of Barton county* under the aforesaid permanent appropriation of the Parry forty made ten years before; and that such seizin, if any, could not support dower

under sections 2933 and 2956, Revised Statutes 1899, because he was not seized of an "estate of *inheritance*" during coverture with Nancy, as required by those sections.

It is insisted that the land having been dedicated to public use, Parry's wife could not be endowed under the doctrine of the Venable case, 112 Mo. 103; the Chouteau case, 122 Mo. 375; the Baker case, 122 Mo. 396; the Chrisman case, 202 Mo. 605. [See, also, Benton v. St. Louis, 217 Mo. 687.] The doctrine of those cases might well apply to the public square and the streets and alleys and the jail lot, etc., but we need not inquire whether it would apply to the lots and blocks in Lamar. That question is reserved.

III. In their briefs counsel discuss interesting questions on the legal effect of the narrations in Parry's deed of 1869; for instance whether his wife, Nancy, is bound by the narration made in that deed to the effect that a former deed was executed by him in 1856 for county seat purposes which had been lost or destroyed. Further, whether, assuming his 1856 deed was a warranty, the title acquired under the patent from the State and county deed of 1867 inured to the benefit of the county under the 1856 deed. In the view we take of the case such questions are somewhat afield—the case being disposed of on other grounds.

Counsel discuss with force and acumen many questions relating to the admissibility of evidence. As to those it may be said that the situation and transactions developed at the trial by the oral evidence and fragmentary records introduced were ancient ones. The primary evidence being lost, secondary evidence was allowed to establish lost records, deeds, surveys, plats and to reconstruct for judicial purposes facts and a situation dimmed by time. It is a common-place of the law that the rules of evidence

are much relaxed under such conditions. We shall not encumber the opinion by citing authorities to the point. They will be found in the briefs of counsel. We have examined the assignments of· error in this regard and find none materially affecting the merits of the case. It was well tried.

This court has been liberal in allowing dower. [Chrisman v. Linderman, 202 Mo. 605, and cases cited.] It has never stood on dry and lifeless technicalities in endowing widows; but we can find no substantial merit in Mrs. Parry's claim for dower in the lot in question. Accordingly, the judgment should be affirmed. It is so ordered. All concur.